UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

UNITED STATES OF AMERICA,

v.                                            Criminal No. 2:13cr98

IRFAN M. JAMEEL,

Defendant.

## OPINION AND ORDER

This matter is before the Court on Defendant Irfan Jameel's ("Defendant") Motion for Variance Sentence ("Variance Motion"), Doc. 160, and various objections to the Presentence Report ("PSR") contained in Defendant's Position on Sentencing, Doc. 172. This Order also briefly addresses Defendant's Motion to Strike Government's Unauthorized Filing ("Motion to Strike"), Doc. 174. Ruling from the bench, the Court **DENIED** Defendant's Variance Motion on the merits, **DISMISSED** Defendant's Motion to Strike as moot, and Defendant's objections to the PSR were **SUSTAINED IN PART** and **OVERRULED IN PART**. This ruling resulted in a revised total offense level of 29 and an advisory guidelines range of 87 to 108 months.

### I. PROCEDURAL HISTORY

On July 25, 2013, Defendant was named in a four-count Indictment, charging him with Wire Fraud Affecting a Financial Institution, in violation of 18 U.S.C. § 1343, Count 1; Financial Institution Fraud, in violation of 18 U.S.C. § 1344, Counts 2–3; and Use of a False Social Security Number, in violation of 42 U.S.C. § 408(a)(7)(B), Count 4. Doc. 15. Defendant was found guilty of all four counts on June 12, 2014. Doc. 137.

Defendant's PSR placed him in criminal history category I and indicated a total offense level of 33. The total offense level came from a base offense level of seven, a sixteen-level

enhancement for loss amount, two for fraud in a bankruptcy proceeding, two for using sophisticated means, two for deriving more than one million dollars in gross receipts, two for using a special skill, and two for obstructing justice. Doc. 168 at 15. These calculations resulted in an initial advisory Guidelines range of 135 to 168 months imprisonment. Id. at 32.

Prior to sentencing, Defendant filed a Motion for Variance Sentence on October 30, 2014. Doc. 160. The United States of America ("the Government") filed its Position on Sentencing on November 17, 2014. Doc. 167. On November 25, 2014, Defendant simultaneously filed his Position on Sentencing and Reply in Support of Motion for Variance Sentence. Doc. 172.

The Government filed a Reply to Defendant's Position on Sentencing on December 1, 2014. Doc. 173. That same day, Defendant filed the Motion to Strike, Doc. 174, requesting that the Court strike the Government's previous filing as incompatible with the Court's Sentencing Procedures. See Doc. 139 at ¶ 7. The sentencing hearing was held on December 2, 2014, and after issuing the findings and rulings contained in this Order the Court sentenced Defendant to 108 months imprisonment. Doc. 176.

## II. LEGAL STANDARDS

A district court undertakes "a multi-step process" in determining an appropriate criminal sentence. United States v. Doan, 498 F. Supp. 2d 816, 817 (E.D. Va. 2007) (citing United States v. Booker, 543 U.S. 220 (2005)). The process always begins "by correctly calculating the applicable Guidelines range." United States v. Diosdado-Star, 630 F.3d 359, 364 (4th Cir. 2011) (quoting Gall v. United States, 552 U.S. 38, 49 (2007)). Once the appropriate range is established, the court must consider whether a sentence within that range serves the sentencing factors established in 18 U.S.C. § 3553(a). United States v. Green, 436 F.3d 449, 456 (4th Cir.

2006). In doing so, the trial court "may hear arguments by prosecution or defense that the Guidelines sentence should not apply, perhaps because (as the Guidelines themselves foresee) the case at hand falls outside the 'heartland' to which the Commission intends individual Guidelines to apply." Diosdado-Star, 630 F.3d at 364 (quoting Rita v. United States, 551 U.S. 338, 351 (2007)). In ruling on such arguments, the district court must "set forth . . . a reasoned basis for exercising [its] own legal decisionmaking authority." Rita, 551 U.S. at 356.

### III. ANALYSIS

At sentencing and in his filings, Defendant maintained six objections to the PSR, one motion for a downward departure, and a motion for a variance sentence. Additionally, Defendant moved to strike the final Reply filed by the Government. Each request was addressed by the Court at the sentencing hearing and the rulings made from the bench are hereby explained.

#### A. Objections to the Sentence Enhancements in the PSR

Defendant's six objections cover all of the enhancements applied to the base offense level in his PSR. As to the enhancements under § 2B1.1(b)(9)(B) for fraud in a bankruptcy proceeding, § 2B1.1(b)(10)(C) for using sophisticated means, § 2B1.1(b)(16)(A) for deriving more than one million dollars in gross receipts from one or more financial institutions, and § 3C1.1 for obstructing justice, Defendant simply denied that he committed the fraud or misrepresentation required for these enhancements to properly apply. Doc. 172 at 2. The Court rejected this argument, finding that Defendant's testimony at trial, as well as the additional evidence offered at sentencing, were sufficient to support the application of these enhancements. Accordingly, Defendant's general objection was **OVERRULED**.

*i. Loss Calculation under § 2B1.1 and § 3D1.3(b)*

The parties disagree regarding two crucial aspects of the loss calculation. First, the Court must determine the proper loss amount of the SunTrust loan under § 2B1.1, specifically in the context of Application Note 3(D)(i). Second, if the Court agrees with Defendant on the first issue, the Court must then decide the proper way to aggregate the losses and related collateral according to § 3D1.3(b).

The Court found an unpaid principal balance amount of $2,468,365.08 on the SunTrust loan.[1] The Government requested that the Court increase the loss amount related to the SunTrust loan by $256,943.15 by including certain out-of-pocket costs such as escrow payments, miscellaneous fees, and corporate advances. See Gov't Sentencing Ex. 1. This proposal would bring the total SunTrust loss to $2,725,308.23.

Application Note 3(D)(i) to § 2B1.1 provides that "[l]oss shall not include . . . [i]nterest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs." Neither party nor the Court identified Fourth Circuit precedent on this issue. The Government argued that these out-of-pocket costs should be included in the loss amount because they are a part of the actual loss suffered by the victim. See United States v. Simpson, 741 F.3d 539, 558 (5th Cir. 2014).

The Court disagreed however, finding that the purpose of Application Note 3(D)(i) "is to ensure that 'the offense level for a financial crime is not increased if the prosecution is delayed, even though the delay increases the cost of the crime.'" United States v. Pouparina, 577 Fed. App'x 939, 941 (11th Cir. 2014) (quoting United States v. Peel, 595 F.3d 763, 772 (7th Cir. 2010)). Furthermore, if the

---

[1] This amount was also in contention as Defendant argued that the Court should apply the original loan amount of 2,468,365.08. The Government, however, presented evidence at sentencing that Defendant signed a modification agreement, dated July 1, 2008, which increased the unpaid principal balance of the loan via the addition of interest and various fees. The Court **FOUND** that $2,468,365.08 was the appropriate starting point.

4

United States Sentencing Commission intended for all out-of-pocket losses of the victim to define the loss amount under § 2B1.1, that could have easily and clearly been spelled out through the use of inclusive language. Instead, the Guidelines employ exclusive language in Application Note 3(D)(i), leaving it for this Court to determine the precise meaning of "other similar costs." This Court agreed with the Seventh and Eleventh Circuits and **FOUND** that the $256,943.15 in additional costs to SunTrust should not be included under § 2B1.1, and that the proper loss amount was $2,468,365.08.

Having found for the Defendant on the first issue, the Court was required to reach the second issue of how to appropriately aggregate the loss amounts and collateral. This issue arises because the assessed value of the collateral property ($3,083,000) shared by both the Gateway and SunTrust loans is greater than the loss amount associated with either individual loan. Section 3D1.3(b) states that "the offense level applicable to a Group is the offense level corresponding to the aggregated quantity."

Defendant argues that "aggregated quantity" means that the proper procedure is to group all of the loss which relates to a single item of collateral before crediting it. Therefore, the Gateway and SunTrust loans would be aggregated to $3,812,281.77 and then reduced by their shared collateral to a loss amount of $729,281.77. Adding in the additional Credit Union loan equals a total loss amount of $747,182.18.

The Government argued that the Court should take what it sees as the practical approach. They argued that the total collateral should only offset one of the loans because, allegedly, it can only be collected by one of the creditors. This would result in a loss amount of zero for the SunTrust loan, but responsibility for the full amount of the remaining loans, equaling $1,361,817.10.

There appears to be neither mandatory nor persuasive authority on this issue, leaving this Court with the sole responsibility to determine the meaning of "aggregated quantity" as it applies to the facts of this case. Here, the Court determined that the plain meaning of "aggregated" requires that loss amounts which share a particular item of collateral must be added together before crediting the value of the collateral. This also supports the more practical notion that when an item of collateral is sold to pay a debt, the excess value passes either to the next creditor in line, or back to the debtor, rather than disappearing entirely. Accordingly, the Court **SUSTAINED** Defendant's objection, **FOUND** that the proper loss amount was more than $400,000 but less than $1,000,000, and decreased the total offense level by two.

*ii. Enhancement for the Use of a Special Skill under § 3B1.1*

The Guidelines define a "special skill" as one "not possessed by members of the general public." U.S.S.G. § 3B1.3. For this two-level enhancement to apply, that skill must be used "in a manner that significantly facilitated the commission or concealment of the offense." Id.

Defendant argued that this enhancement should not be applied because Defendant's only "special skill" is as a doctor and that he did not use that skill in the commission of the instant offenses. The Government argued that Defendant used the special skills provided by his background in medical inventing to convince the victim banks that they should finance him. Specifically, they pointed to Defendant's fraudulent patent application for "bioceramic wood and method of production," and argued that his use of scientific terminology and theories shows his special skills in action. The Government alleged that the loan officers at the banks relied on his possession of a special skill when deciding to issue the loans and that, as a result, this enhancement is appropriate.

6

The Court **SUSTAINED** this objection, finding that although Defendant's medical background likely influenced his choice of deceptions, he did not significantly rely on any special skill in the commission of the offense. The Government's evidence at sentencing showed that large sections of the patent application used in the fraud were directly plagiarized from a college biology textbook, further showing that no particular skills other than charisma and deception were necessary for Defendant to obtain the loans. Defendant also created a website and fraudulently represented the existence of a medical company, but again, Defendant's choice of the medical field as the setting for these deceptions shows only his general familiarity with the field.

The Court believes that the Guidelines' requirement that the special skill must "significantly facilitate[]" the crime requires a more direct exploitation of the criminal's special skill than demonstrated by the actions of this Defendant. Accordingly, the Court **FOUND** that Defendant did not utilize a special skill in such a way as to satisfy the requirements of § 3B1.3, and **SUSTAINED** Defendant's objection thereby decreasing the total offense level by two.

**B. Motion for a Downward Departure under § 5K2.13 & § 5H1.3**

Guidelines § 5K2.13 permits the Court to depart downward in the case of "significantly reduced mental capacity." This means that "the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful." Id. at app. n.1. Similarly, § 5H1.3 permits departure if a mental or emotional condition is "present to an unusual degree and distinguish[es] the case from the typical cases covered by the guidelines." The same section also indicates that such "conditions may be relevant in determining the conditions of probation or supervised release." U.S.S.G. § 5H1.3.

Defendant bears the burden of proving the elements of a departure. See United States v. Valdez, 426 F.3d 178, 184 (2d Cir. 2005).

Defendant submitted himself to psychological review by a privately retained doctor, Weare A. Zwemer. Dr. Zwemer's report, filed under seal, opined that Defendant:

> [S]uffers from a major mental illness, most parsimoniously contained by the diagnosis of Schizoaffective Disorder. At the least, this condition impacted his judgment over the period of the index offenses [and] likely affected his perception of risk. His condition may have allowed him to rationalize what he perceived as minor misrepresentations [and] he may have perceived his actions as necessary to counter the conspiracy of others. Alternatively, he may have assumed that his exceptional intelligence would have overcome challenge from individuals of lesser insight into financial realities.

Doc. 166 at 12. Dr. Zwemer "encourage[d] the Court to recognize the contribution of mental illness to the commission of these crimes in its disposition [and] strongly recommend[ed] that he be ordered to psychiatric services in the context of incarceration." Id.[2]

The Government pointed to the possibility that Defendant is fabricating his evidence of mental illness based on the "convenient" timing of his claims. Doc. 167 at 29–30. Defendant asserts that he did not reveal this evidence earlier so as to not make him appear crazy leading up to trial. Id. Finally, the Government highlighted the many sane, albeit criminal, motives that Defendant had for his actions, most notably greed and the desire to maintain personal status.

The Court **DENIED** the request for a downward departure on the basis that Defendant functioned at a very high level of reasoning and sophistication during the period of the offense, and according to the Court's perception throughout trial presented no significant impairment justifying a reduced sentence. Accordingly, the Court **FOUND** that Defendant did not meet his

---

[2] Dr. Zwemer's full report is attached to Defendant's Judgment, entered this same day, so that it will be available to the Bureau of Prisons.

burden to establish the elements necessary for a downward departure under either § 5K2.13 or § 5H1.3.

## C. Motion for a Downward Variance Due to Overemphasis on Loss Amounts

Defendant argued in his Variance Motion that the loss table of §2B1.1 is "inconsistent, irrational, and 'a black stain on common sense.'" Doc. 161 at 4 (quoting David Debold & Matthew Benjamin, Essay, Losing Ground – In Search of a Remedy for the Overemphasis on Loss and Other Culpability Factors in the Sentencing Guidelines for Fraud and Theft, 160 U. Pa. L. Rev. PENNumbra 141, 143 (2011)). Defendant points out that if he were before the Court under the original 1988 version of the Guidelines that his total offense level would have been eight levels lower. Accordingly, Defendant's Variance Motion requests a downward variance in relation to an eight level reduction as a way for the Court to correct the alleged recent overemphasis on loss amounts.

The Government defends the amendments made over time as sound and "the result of Sentencing Commission study of economic crime issues over a number of years." Doc. 167 at 35 (quoting U.S.S.G. App. C, Amend. 617 (Reason for Amendment) at 176). The Government further points out the amendments lessened or eliminated several old enhancements not mentioned by Defendant, and that any increases in severity were responding to a perceived "under-punish[ment]" of individuals similar to Defendant. In sum, the Government argues that § 2B1.1 recommends a serious punishment for a serious offense, and that this Court should reject the notion of applying an older standard simply because it was more lenient to offenders.

Although the Court recognized that the Guidelines range before it is merely advisory, see United States v. Booker, 543 U.S. 220, 245 (2005), it found no reason to issue a downward variance sentence in this case. The Court is not swayed by Defendant's policy arguments, and

found that the enhancements remaining after ruling on Defendant's objections were reasonable and appropriate. The Court agreed with the Government regarding the severity of Defendant's crimes and that § 2B1.1 responds to that severity accordingly. The Court must also consider that the relevant conduct in the PSR and the victim testimony at sentencing presented largely aggravating rather than mitigating factors. See, e.g., Doc. 168 ¶¶ 85–96. Defendant's request for a downward variance was thereby **DENIED**, a ruling consistent with the ultimate selection of a sentence on the highest end of the revised advisory Guidelines range.

**D. Motion to Strike**

The Government's Reply to Defendant's Position on Sentencing, filed on December 1, 2014, Doc. 173, was not expressly permitted by the Court's Order on Sentencing Procedures. Additionally, the Government did not seek leave of Court. As such, it was within the Court's discretion to grant Defendant's Motion to Strike, or simply to sua sponte disregard the filing. At sentencing however, the Court indicated that it had reviewed the Government's Reply prior to the filing of the Motion to Strike, but had not been persuaded by its arguments. Accordingly, the Motion to Strike was **DISMISSED** as moot.

## IV. CONCLUSION

For the foregoing reasons, Defendant's objections to the PSR, Doc. 172, were **SUSTAINED IN PART** and **OVERRULED IN PART**, resulting in a total offense level of 29 and a revised advisory Guidelines range of 87 to 108 months. Defendant's requests for a downward departure and a downward variance, Doc. 160, were **DENIED**, and a sentence within the advisory Guidelines range was selected as being consistent with the statutory sentencing factors. Finally, Defendant's Motion to Strike, Doc. 174, was **DISMISSED** as moot.

The Clerk is **REQUESTED** to mail a copy of this Order to all counsel of record.

It is so **ORDERED.**

/s/
Henry Coke Morgan, Jr.
Senior United States District Judge

HENRY COKE MORGAN, JR.
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
December 8, 2014